**WOODS v. D'AVINO et al.**

Civ. No. 2297.

United States District Court
D. Connecticut.
Dec. 22, 1948.

———◇———

Edwin J. Donovan, Rent Litigation Atty., Charles J. Delaney, Litigation Unit Atty., and Edmund M. Sweeney, Litigation Section Atty., all of Boston Mass., for plaintiff.

John A. Cooney, of New Haven, Conn., for defendants.

HINCKS, Chief Judge.

The plaintiff Housing Expediter brings this action against a landlord and her agent pursuant to Sections 204(a) and 206(b) of the Housing and Rent Act of 1947, 50 U.S.C.A.Appendix, §§ 1894(a), 1896(b), seeking a temporary and permanent injunction and a mandatory order of restitution for rent allegedly collected above the maximum legal rent.

### Findings of Fact

1. The defendant, Mary A. D'Avino, is a resident of West Haven, Connecticut, and at the times hereinafter mentioned was the landlord of a certain dwelling, hereinafter referred to as "the premises", located at 36 Point Beach Drive, Milford, Connecticut, within the New Haven Defense-Rental Area.

2. The defendant, George C. Hancock, hereinafter called the agent, is a resident of New Haven, Connecticut, and was at the times hereinafter alleged the agent for the defendant, Mary A. D'Avino, in letting and collecting the rent for the premises and acted throughout within the scope of his authority.

3. Said premises constituted "Resort Housing" as defined in the Regulations under the Act. As such, they were subject to rent controls for the period from October 1, 1947 to May 31, 1948, but were not subject to rent controls during the period from June 1, 1947 to September 30, 1947.

4. The established maximum rent for the premises from October 1, 1947 to May 31, 1948, was $50 per month.

5. The agent advertised the premises as available to University students for rental for the period September 15, 1947 to June 15, 1948 and in June, 1947, in a telephone conversation with Robert G. Brown, hereinafter called the tenant, who had called him in response to the said advertisement, stated that the premises were available for the nine months from September 15, 1947 to June 15, 1948, at a rental of $720 for the period. The agent admitted that the rental requested averaged $80 per month, but explained that because of the O. P. A. regulations and the ceiling of $50 per month on the premises during the winter months from October 1, 1947 to May 31, 1948, in order to make up the total rent per month which the landlord desired two leases would be necessary, one for the winter months at $50 per month, the maximum legal rent, and one at a higher rent for the additional two weeks before and after the eight-month period of control which will hereinafter be referred to as the "marginal weeks." The tenant then told the agent that he already had accommodations available until October first and asked if it would be possible to get a lease as of October first, to which the agent replied in the negative, adding that in order to get a lease of the premises the tenant would have to rent as of September 15th.

6. On June 19, 1947, the tenant signed two leases, both as submitted by the agent in behalf of the landlord: one was for the rental of the premises from September 15, 1947 to September 30, 1947, and from June 1, 1948 through September 15, 1948, for the total rent of $1280, payable $160 upon signing, $160 on March 1, 1948, and $960 on or before June 1, 1948, with leave to terminate as of June 15th by written notice or by failing to make said payment of $960 on June first: the other provided for the rental of

the premises from October 1, 1947 through May 31, 1948, for the total rental of $400, payable $50 per month. .

7. The tenant thereafter occupied the premises from September 15, 1947 to June 13, 1948, and made payments of rent aggregating $720, which included all the payments called for in both leases except the payment of $960 due June 1st.

8. The plaintiff failed to prove that the landlord's charge for the marginal weeks exceeded the fair rental value of the premises.

As to this the only evidence of rental value was contained in the testimony of the agent himself who said that he explained to the tenant that "these houses rented some times for as much as $75 or $100 a week in the summer" and that he "discussed it with him on the basis that that particular house would rent for somewhere approximately $75 to $80 a week in the summer." After all, the government knew from my interlocutory memorandum in this case that I considered that the rental value of the premises had an important bearing on the issues. Notwithstanding, it offered no evidence at all on that issue. Under the circumstances, I do not feel that I should seize upon the somewhat vague testimony of a defendant as to a *summer* value of $80 to $100 per week as a satisfactory basis for an inference having sufficient certainty to satisfy the burden of proof that the actual rental value for the marginal weeks was substantially less than $80 per week. This is so even if I might properly take judicial notice of the fact that rental values for the marginal weeks are less than those obtaining for the weeks at the height of the vacation season.

9. Even if, contrary to the foregoing finding, it could be found that $80 per week exceeded the real rental value for the marginal weeks, there was no evidence whatever as to the amount of such excess.

## Conclusions of Law

■ 1. Although by Section 8(a) of the Rent Regulations under the Housing and Rent Act of 1947, there was provision against evasion "by tying agreements", with respect to premises such as resort properties which are subject to control for part of the year and exempt for the remainder of the year the inclusion of an unwanted period in the overall term as a condition to the granting of a lease, without more, will not constitute a prohibited tying agreement. Only if the aggregate rent exceeds the established maximum for so much of the term as is subject to control plus the fair market value for so much of the term as is exempt will a lease of such premises be deemed to be conditioned on an evasive, and hence a prohibited, tying agreement.

■ It is true, I think, as plaintiff contends, that under the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., tying agreements involving the sale of commodities as a means of evasion had a definition broad enough to include the sale of all commodities unwanted by the purchaser irrespective of reasonableness of the price or of conformity to established ceilings. United States v. George F. Fish Co., 2 Cir., 154 F.2d 798, and United States v. De Porceri, 2 Cir., 161 F. 2d 526. But when rent control on a resort property is restricted to only a portion of the year, Controlled Housing Rent Regulation (12 F.R. 4331) Sec.1(b) (6), the definition of applicable tying agreements (which are not expressly defined in the Regulations) must be modified to reflect the limited nature of the restriction. Certainly there is nothing in the law or regulations which with respect to property subject to such restricted control prohibits a lease having a term which exceeds in duration the restricted, or controlled, period. The obvious purpose of the administrative division of the year into two periods was to make resort housing available at comparatively modest rentals for occupancy in the winter months, when it had theretofore largely stood empty, without depriving owners of the higher rentals obtainable for the summer vacation season. Such objectives were plainly sanctioned by the general directives of the Act itself. 50 U.S.C.A. Appendix, § 1894(b) (1). But from the division of the calendar for the purpose of fixing seasonal rental bases no need arose to deprive owners of the right to fix the duration of the terms of such leases as they should give and it is not suggested that the regulation even purported to sanction the

destruction of that normal incident to ownership. It follows that notwithstanding the division of the year into controlled and exempt periods an owner was not forbidden to give a tenant the right to occupy throughout both periods or any part of either or both, or, conversely to decline to grant such a term. Consequently, the inclusion within the term of a lease of time within both periods, without more, could not constitute a forbidden "tying agreement" within the meaning of the regulation.

The situation differs from that involving sales. For the seller who does not condition a desired sale upon the sale of an unwanted item is not thereby precluded from selling elsewhere the unwanted item. But if a landlord rents to a tenant desiring, say, only an eight-month term and does not tie in (to use the questioned word) the term of an additional month the result is twofold, viz.; (1) the nine-month term (Sept. 15–June 15) which is to the mutual benefit of both landlord and the normal University student will no longer be available and (2) the market for renting the premises for the ninth month will be seriously curtailed.

With these considerations in mind it is apparent, as I hold, that as to leases of real estate an agreement tying into the term some unwanted time "evades" and is therefore forbidden but only if it provides for an aggregate rent exceeding the established maximum for so much of the term as is subject to control *plus the fair rental value for so much of the term as is exempt.*

2. Neither a stipulation that rent be paid in advance nor the receipt of rent so paid is demonstrative of a tying agreement made with intent to evade the regulations and the receipt of $160 at or about the time the leases were signed is not of itself proof of an overcharge.

3. In the absence of an express agreement for rent in excess of the maximum for so much of the term as was subject to control, the plaintiff's failure to prove that the rent agreed upon ostensibly as the rent for so much of the term as was not subject to such control exceeded the fair rental value of the premises for that period left no room for an inference that the comprehensive transaction was a sham to cloak the exaction of rent in excess of that authorized for the period under control.

4. The defendants are entitled to judgment.